Suzanne E. MacPHERSON, Plaintiff,

v.

SEARLE & CO. and Donald C. Meek, M.D., Defendants.

Civ. A. No. 90–0095.

United States District Court, District of Columbia.

Oct. 15, 1991.

Harry Tun, Tun & Associates, Washington, D.C., Venita M. Lang, Tacoma, Wash., Grandison Hill, Hill & Gordon, Washington, D.C., for plaintiff Suzanne E. MacPherson.

Gary A. Godard, Kenneth J. Barton, Jr., Godard, West & Adelman, P.C., Fairfax, Va., for defendant Donald C. Meek, M.D.

Elizabeth C. Honeywell, Nancy A. Voisin, Venable, Baetjer & Howard, Baltimore, Md., for defendant Searle & Co.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

This is a negligence and product liability case involving the use of the oral contraceptive Demulen 1/35. The plaintiff, Ms. MacPherson, obtained Demulen 1/35 after her obstetrician/gynecologist, defendant Dr. Meek, prescribed it at his office in Chevy Chase, Maryland. Dr. Meek is a Maryland citizen. Ms. MacPherson, who was a student at Howard University in the District of Columbia during the events at issue in this case, is a Massachusetts citizen. Defendant Searle & Co., the pharmaceutical firm that manufactures Demulen 1/35 and distributes it nationwide, is incorporated under Delaware law and maintains its principal place of business in the Commonwealth of Puerto Rico.[1] Searle removed this case from the Superior Court for the District of Columbia on January 17, 1990, based on complete diversity of the parties and alleged damages of $1 Million. 28 U.S.C. 1441(a), 1332(a). The parties appear to agree that District of Columbia law applies to their dispute.[2]

Discovery in this matter closed on June 17, 1991. Both defendants Searle and Dr. Meek now move for summary judgment pursuant to Rule 56(b), Fed.R.Civ.P. For the reasons discussed below, summary judgment must be granted for defendant Searle and denied for defendant Dr. Meek.

### The Facts

The record indicates the following as undisputed facts. Ms. MacPherson first consulted Dr. Meek in 1977. He first prescribed Demulen for her in May 1979 to treat menstrual irregularity, and she took the drug for one year or less. In September 1984, Dr. Meek again prescribed Demulen for Ms. MacPherson's use, this time as a contraceptive, but she apparently did not take the pills at that time. Finally, on October 22, 1986, Ms. MacPherson obtained a third Demulen prescription from Dr. Meek for contraceptive use. She said she had no health problems and voiced no physical complaints at that time, and Dr. Meek detected nothing wrong during a physical examination. Ms. MacPherson then took the prescribed Demulen for six to eight weeks until late-December 1986, when she suffered vision loss in her left eye caused by a central retinal vein occlusion (retinal thrombosis, or a blood clot in the eye). In January 1987, Ms. MacPherson consulted

1. *See* Searle's Notice of Removal pursuant to 28 U.S.C. 1446(b).

2. *See, e.g.,* Searle's Memorandum in Support of Motion for Summary Judgment at 2; Meek's Memorandum and Points and Authorities in Support of Motion for Summary Judgment at 3–5; MacPherson's Opposition to Defendant Searle's Motion for Summary Judgment at 3; and MacPherson's Opposition to Defendant Meek's Motion for Summary Judgment at 4.

Ms. MacPherson states in her First Amended Complaint at 2 that she "took said pills almost exclusively while in the District of Columbia, except for a few occasions when she took them in the State of Maryland."

an ophthalmologist about her vision loss; he advised her to immediately stop taking Demulen, advice with which Dr. Meek concurred.

Dr. Meek asserts that, at the times he prescribed Demulen for Ms. MacPherson, he had full knowledge of the risks associated with oral contraceptives, including an awareness that blood-clotting disorders causing impaired vision and blindness might result from their use, and that he considered these risks to be genuine. Dr. Meek said he gained this knowledge from sources including medical journal articles and professional meetings, as well as from information on Demulen provided to him by Searle.

Searle's information on Demulen pertinent to this case is in three forms: one intended for the physician, and two intended for the patient. The first form, known as "physician prescribing information," or "product information," is distributed to physicians along with samples of the drug and is reprinted in the Physicians' Desk Reference (PDR). The 1986 PDR excerpt on Demulen 1/35 is extensive, consisting of nine three-columned pages of agate type. Among the information contained there is the chemistry of Demulen 1/35 and, as Searle describes it, "indications for use, contraindications, warnings, precautions and adverse reactions for the physician's use in making his prescribing decision."[3] Because Demulen is a prescription drug, the contents of the "physician prescribing information" for the drug is subject to the approval of the U.S. Food and Drug Administration. *See* 21 U.S.C. 355, 21 C.F.R. 314.50(a), 314.100.

The warnings contained in the "physician prescribing information" on Demulen that are pertinent to Ms. MacPherson's claim are attached to this order.[4] The information states that these warnings are based on "[s]tudies ... show[ing] a positive asso-

ciation between the dose of estrogens in oral contraceptives and the risk of thromboembolism." These warnings alert physicians to the potential for oral contraceptive users, albeit not Demulen users *per se*, to suffer the precise malady affecting Ms. MacPherson; *i.e.*, "retinal thrombosis" and "partial or complete loss of vision." Ms. MacPherson apparently concedes the adequacy of the warning contained in the 1986 "physician's prescribing information." She states in her opposition to summary judgment that

> Searle has warned in its brochure to physicians and in the [Physicians Desk Reference], and indeed is required by the FDA to warn, that a serious side effect of Demulen 1/35 can be blood clots in the eyes, *resulting in blindness or impairment or vision*—the precise injury sustained by the plaintiff.[5]

In addition, as Searle points out, plaintiff has advanced no expert opinion that the "physician prescribing information" is inadequate.[6] Ms. MacPherson also does not contest that the 1986 "physician prescribing information" for Demulen complied with FDA regulations governing its content.

The second form of information from Searle that is pertinent to this case is a pamphlet entitled "What You Should Know About Oral Contraceptives," which is distributed and intended by Searle to be passed on to the patient by the physician or pharmacist at the time Demulen is prescribed. The contents of this pamphlet are set forth in three of the nine pages of the PDR excerpt on Demulen. The pamphlet imparts detailed warnings on "The Dangers of Oral Contraceptives," although not of Demulen *per se*, and includes an extensive section on "a. Circulatory Disorders (Blood Clots, Strokes, and Heart Attacks)," which warns in one sentence: "Clots also occur rarely in the blood vessels of the eye,

---

3. Searle's Memorandum in Support of Motion for Summary Judgment at 15.

4. Searle attaches the entire Physicians' Desk Reference discussion of Demulen as Exhibit A to its Memorandum in Support of Summary Judgment.

5. MacPherson's Opposition to Meek's Motion for Summary Judgment at 11.

6. Searle's Memorandum in Support of Summary Judgment at 18–27.

resulting in blindness or impairment of vision in that eye." Counsel for Searle stated at a September 19, 1991, motions hearing on this matter that Ms. MacPherson has denied receiving the "What You Should Know" pamphlet from either Dr. Meek or her pharmacist. However, Ms. MacPherson does not contend that Searle failed to provide these pamphlets to either Dr. Meek or the pharmacist who filled her prescription.

The third form of information from Searle that is pertinent to this case is a so-called "package insert," which is a brief circular on Demulen that is packaged directly with the tablets. The warnings portion of this package insert is also set forth in the PDR excerpt on Demulen. The Food and Drug Administration has required all oral contraceptive manufacturers since 1970 to package these advisory inserts together with their products. The inserts must be written in lay terminology to FDA specifications and are intended specifically for the information of the actual users of the drug. *See Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 93 (2d Cir. 1980) (citing 21 C.F.R. 310.501).[7]

The package insert that accompanied Demulen 1/35 prescriptions in 1986 is also attached to this order. The insert discusses the potential side effects of "oral contraceptives" and "the pill" in the same generic terms as does the "physician prescribing information" and the pamphlet; the name Demulen does not appear in the insert in the direct context of these warnings. Notably, the insert alerts the user in its first line to "the detailed leaflet given to you with your supply of pills" (i.e., the pamphlet discussed previously) and admonishes the user that "proper use of contraceptives requires that they be taken under your doctor's continuing supervision, because

they can be associated with serious side effects which may be fatal." First among the serious side effects listed is "1. Blood clots in the ... eyes,...." Listed third is "3. Disorders of Vision." Three of five additional side effects listed in the Demulen insert involve bleeding and blood-related maladies.

Ms. MacPherson acknowledges that she "read the literature provided in the birth control pill package," indicating the package insert. She asserts, however, that "as a lay person reading the risks and adverse reaction section provided by Searle, [she] did not realize that permanent loss of eyesight was a risk associated with birth control pills."[8] As with the "physician prescribing information," Ms. MacPherson does not allege that the Demulen package insert failed to comply with FDA regulation 21 C.F.R. 310.501, which dictates its contents.

*Summary Judgment Standard*

The Supreme Court explored the summary judgment standard set forth in Rule 56(c), Fed.R.Civ.P., in several recent, contemporaneous cases. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985). The Court advised generally that in considering summary judgment, "all inferences to be drawn ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable ..., or is not

7. The FDA revised its package insert regulations on oral contraceptives in 1978 to require even more specificity in the warnings they impart. Physicians' organizations and pharmaceutical manufacturers hotly contested these revisions based partly on the contention that the more detailed warnings were alarmist, promoting discontinued treatments, suggestion-induced symptoms and self-diagnosis among patients, and therefore constituted an unwarranted interference with the doctor-patient relationship. *See*

*Pharmaceutical Manufacturers Ass'n v. Food and Drug Administration*, 484 F.Supp. 1179, 1182, 1187–91 (D.Del.1980). The FDA considered and rejected this view, and the FDA's right to require package inserts was sustained after a court challenge. *Id.* at 1191.

8. MacPherson's Opposition to Searle's Motion for Judgment at 2.

significantly probative, ... summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

Justice Brennan provided this and other district courts with more specific guidance in application of the standard. *Celotex,* 477 U.S. at 330–34, 106 S.Ct. at 2556–58 (Brennan, J., dissenting).[9] Apropos to this case, he said:

> If the burden of persuasion at trial would be on the *nonmoving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.... If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

*Id.* at 331, 106 S.Ct. at 2557 (citations omitted) (emphasis in the original). A movant taking the second course must "affirmatively show" the absence of evidence in the record by, *e.g.,* deposing the opposing party's witnesses or establishing the inadequacy of documentary evidence. *Id.* at 332, 106 S.Ct. at 2557.

*The Complaint*

To apply the summary judgment standard in this matter, it is first necessary to analyze Ms. MacPherson's complaint to identify her viable claims under District of Columbia law. Ms. MacPherson alleges four counts against the defendants: one count each of negligence, breach of warranty, and strict liability against Searle, and one count of negligence—in essence medical malpractice—against Dr. Meek.

Examining the counts against Searle, Ms. MacPherson first alleges negligence "in the design and manufacture of said pills and in ... failure to give adequate warning of the defects or side effects ..., which were known by the defendant." In reply, Searle points out that none of plaintiff's Fed.R.Civ.P. 26(b)(4) statements of proposed expert testimony address whether there was something wrong with the Demulen tablets, and that subsequent depositions of the plaintiff's four expert witnesses make clear that they will not testify as to a design or manufacture defect.[10] Ms. MacPherson does not dispute this shortcoming and indeed, in her opposition to summary judgment, characterizes Count I as stating only that "Searle did not adequately *warn* [Ms. MacPherson] or [sic] the risks and adverse reactions associated with taking the oral contraceptive Demulen 1/35."[11] Accordingly, the negligent design and manufacture allegations are negated. The questions for examination on Count I—in addition to the issue of whether Demulen actually injured Ms. MacPherson[12]—are thus exclusively (1) whether Searle bore a duty to warn Ms. MacPherson of any known dangers of Demulen, and (2) if so, whether Searle adequately fulfilled that duty.

■ The same analysis applies to Count III, which asserts Searle's strict liability for Ms. MacPherson's injury. Tort law imposes strict liability for the sale of products "in a defective condition unreasonably dangerous to the user or consumer" where

---

**9.** The majority and dissent both agreed in *Celotex* how the summary judgment burden of proof operates. 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* Sect. 2727 (2d ed. 1983 & Supp.1991).

**10.** Searle's Memorandum in Support of Summary Judgment at 2–3 and n. 1.

**11.** MacPherson's Opposition to Summary Judgment at 2–3.

**12.** *See Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 721 (D.C.App.1985), applying Restatement (Second) of Torts Section 388 as the rule governing negligent failure to warn a consumer of a product's dangers ("One who supplies ... a chattel for another to use is subject to liability ... for physical harm *caused* by the use ..." (emphasis added)).

there is actual causation.[13] A product may be defective in any of three ways: (1) by defective design, (2) by defective manufacture, or (3) by failure of the producer or assembler to warn adequately of a risk related to the way the product was designed. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* Sect. 99, at 695 (5th ed. 1984); Restatement (Second) of Torts Section 402A cmt. k (1965). Because Ms. MacPherson offers no evidence of defective design or manufacture, her strict liability claim also boils down to an allegation of failure to warn adequately.

■ Ms. MacPherson's Count II against Searle, alleging breach of implied warranty of merchantability, need be dealt with only briefly. The District of Columbia Court of Appeals has held that in cases such as this one,

> where no issues unique to warranty, like disclaimer or notice, are presented, a claim of strict liability in tort [is] effectively made out by the count in the complaint for breach of warranty.

*Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 720 (D.C.App.1985). Hence, plaintiff's Count II merges into strict liability Count III.

Finally, Count IV charges Dr. Meek with negligence. Specifically, it alleges (1) that Demulen actually caused Ms. MacPherson's vein occlusion and resultant vision loss and (2) that Dr. Meek breached his duty as Ms. MacPherson's physician by prescribing the Demulen and "failing to adequately warn Ms. MacPherson of the side effects and dangers of using oral contraceptives, including the possibility that she could suffer permanent injury such as the loss of her eye sight."

*District of Columbia Law*

A. Manufacturer's Failure to Warn

■ The District of Columbia Court of Appeals has very recently stated its general standards of liability for a product manufacturer's failure to warn the user of foreseeable risks associated with the product. *East Penn Mfg. Co. v. Pineda,* 578 A.2d 1113, 1118 (D.C.App.1990). Such failure to warn gives rise to causes of action in either negligence or strict liability or both. "The duty of the manufacturer, however, is the same under both theories: essentially one of ordinary care." *Id.* Stated more fully, this duty of ordinary care means that when, as here, the manufacturer knows of the risk or hazard associated with its product, "there will be no liability unless the manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public. Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* Sect. 99, at 697 (5th ed. 1984). Accordingly, Ms. MacPherson's burden of proof as to all counts against Searle appears to be essentially the same; *i.e.,* a duty of ordinary care to warn of known dangers.

Ms. MacPherson states correctly that no court in the District of Columbia has addressed the narrow issue of a drug manufacturer's liability to adequately warn consumers of the inherent dangers associated with the use of oral contraceptives.[14] However, as Ms. MacPherson acknowledges, this Court some years ago adopted for the District of Columbia the so-called "learned intermediary" doctrine regarding the duty to warn owed by manufacturers of prescription pharmaceuticals. *Stottlemire v. Cawood,* 213 F.Supp. 897, 899 (D.D.C.1963). The doctrine holds that, because prescription drugs are available to the public only through a physician and are to be administered only under a physician's supervision, the pharmaceutical manufacturer's duty is to adequately inform the physician, who is "expected to function as a 'learned intermediary' between the company and the patient in protecting the patient and in providing

---

**13.** Restatement (Second) of Torts Section 402A, which comprises the products liability standard in the District of Columbia. *See Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 720, 722, 725 (D.C.App.1985); *East Penn Mfg. Co. v. Pineda,*

578 A.2d 1113 (D.C.App.1990); *see also, Hull v. Eaton Corp.,* 825 F.2d 448, 454 (D.C.Cir.1987).

**14.** MacPherson's Opposition to Summary Judgment at 4.

direct information about the drug to the patient." William J. Curran, Mark A. Hall & David H. Kaye, *Health Care Law, Forensic Science, and Public Policy* 1198 (4th ed. 1990). The D.C. Court of Appeals has recently indicated its approval of the doctrine's application to prescription drug cases. *Mampe v. Ayerst Laboratories*, 548 A.2d 798, 806 n. 6 (D.C.App.1988) (citing *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712, 722 n. 10 (D.C.App.1985)).

Ms. MacPherson argues that, notwithstanding the learned intermediary doctrine, oral contraceptive producers are required by FDA regulation to provide direct warnings to consumers. She argues that the doctrine is therefore not dispositive here because Searle did not fulfill a putative duty to provide to her *directly* adequate warnings about the nature and gravity of dangers associated with oral contraceptive use. This Court is required to look beyond District of Columbia precedent.

### B. Physician's Failure to Warn

The D.C. Court of Appeals set forth the standards applicable to Dr. Meek's summary judgment motion in *Crain v. Allison*, 443 A.2d 558 (D.C.App.1982). In *Crain*, the plaintiff consulted the defendant physician for treatment of swollen fingers, for which the doctor prescribed cortisone injections. Both the package insert and the PDR information on the cortisone prescribed addressed the problems of infection associated with use of cortisone injections. The doctor testified that he was aware of the risks and that he warned the plaintiff of the "remote" possibility of infection before treating her; the plaintiff testified that she was not warned of the risk of infection and that had she been warned, she would not have permitted the cortisone injections. *Id.* at 561.

The trial court denied the doctor's motion for directed verdict[15] and entered judgment on the jury's verdict for the plaintiff,

from which the defendant appealed. In affirming, the Court of Appeals wrote that

[a]lthough the general rule is that juries may not establish the standard of care of a physician without the aid of expert testimony, it has been increasingly recognized that informed consent cases are an exception to that rule.... Thus, establishing the reasonableness of [the doctor's] disclosure to the [plaintiff] was a proper subject for the jury.

*Id.* at 563 (citations omitted). At a minimum, the court said, a physician must disclose to a patient, *inter alia*, "the nature of the proposed treatment ... and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment." *Id.* at 562. The court observed that in the case before it there had been no expert testimony on the standard of care of a physician in obtaining informed consent but that experts had testified on the actual risks involved. The court concluded that "the jury could fairly conclude from the evidence that the warnings were not given or, if given, were unreasonably inadequate under the circumstances." *Id.* at 564.

### Discussion

### A. Dr. Meek's Summary Judgment Motion

■ The record in this case indicates three genuine issues of material fact in dispute between Ms. MacPherson and Dr. Meek that preclude summary judgment for that defendant. First, Dr. Meek, like Searle, denies that Demulen 1/35 actually caused the central retinal vein occlusion that resulted in Ms. MacPherson's vision loss.[16] However, Ms. MacPherson argues that a causal link is clearly indicated in Searle's own warnings, and she has provided an opthalmologist as an expert witness who appears prepared to testify as to a causal link supported by medical litera-

---

**15.** The Supreme Court stated in *Celotex* that the standard for granting summary judgment " 'mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a).' " 477 U.S. at 323, 106 S.Ct. at 2552 (quoting *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511).

**16.** Dr. Meek's Memorandum in Support of Summary Judgment at 1; Searle's Memorandum in Support of Summary Judgment at 3 n. 2.

ture.[17] It is noteworthy on this point that in denying causation, Searle itself stated that "if any trial of this case is found necessary by the Court, it would present extensive evidence on the subject." [18]

Second, Dr. Meek asserts that the standard of care he owed to Ms. MacPherson as her physician did not require him to discuss the risks of central retinal vein occlusion with her when prescribing Demulen. As noted, Ms. MacPherson contends that part of Dr. Meek's duty was to warn her that, by taking Demulen 1/35, she was taking the risk that she could permanently lose her vision. In support of her position, one of Ms. MacPherson's expert witnesses, an obstetrician/gynecologist, opined generally that Dr. Meek violated the requisite standard of care in prescribing for Ms. Mac-Pherson, and the expert stated specifically that the standard of care required a doctor to review with a patient the information contained in the package insert; information which, as previously noted, warns of potentially fatal side effects including blot clots in the eyes and vision disorders.[19]

Third, while Ms. MacPherson acknowledges that Dr. Meek discussed certain risks with her—such as uterine cancer, about which she expressly inquired—she contends that he minimized the dangers of oral contraceptives generally and specifically failed to disclose that potentially fatal or disabling side-effects, including blood clotting and blindness, could result from taking Demulen. Dr. Meek contends that on each occasion he prescribed Demulen for Ms. MacPherson, "[t]he thromboembolic risks were covered. The opathic risks." [20]

In weighing Dr. Meek's summary judgment motion, we must view the evidence in the light most favorable to Ms. MacPherson. In doing so, and applying the standards set forth in *Crain, supra,* to the incongruities set forth above, it appears that "the jury could conclude from the evidence that warnings were not given or, if given, were unreasonably inadequate under the circumstances." 443 A.2d at 565. Ms. MacPherson's argument is further bolstered because, unlike the plaintiff in *Crain,* she has presented some expert testimony on the standard of care of a physician in obtaining informed consent. The dispute as to actual causation also appears to be genuine. For these reasons, summary judgment must be denied to Dr. Meek.

### B. Searle's Summary Judgment Motion

In considering Searle's summary judgment motion, initial attention must be paid to Ms. MacPherson's failure to challenge either the adequacy of Searle's 1986 "physician prescribing information" for Demulen or Dr. Meek's assertion that he was fully advised of Demulen's potential risks from this and other sources when he prescribed the drug to Ms. MacPherson. Searle argues forcefully that establishment of these material facts is dispositive, since the learned intermediary doctrine imposes a duty to warn the physician and not to warn the patient. Searle relies heavily on Judge Harvey's 1975 opinion in the oral contraceptive case *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377 (D.Md.1975), *aff'd* 567 F.2d 269 (4th Cir.1977), as interpreting District of Columbia law to apply the learned intermediary doctrine, but that decision is not binding on this Court.

For her part, Ms. MacPherson contends that the learned intermediary doctrine should not be applied with full force to oral contraceptives in the District of Columbia, primarily because a duty to provide *direct* and adequate warnings to users

---

17. MacPherson's Opposition to Summary Judgment at 6–7, 14, and Exhibit E (excerpt of deposition of Jonca C. Bull, M.D.). *See also* Searle's Memorandum in Support of Summary Judgment at 18–20 and Exhibit 3 (excerpts of deposition of Jonca C. Bull, M.D.).

18. Searle's Memorandum in Support of Summary Judgment at 3 n. 2.

19. MacPherson's Response to Dr. Meek's Reply to Opposition to Summary Judgment at 4 and Exhibit B (deposition of Dr. Paul Zarutskie); Dr. Meek's Memorandum in Support of Summary Judgment at 4.

20. Dr. Meek's Memorandum in Support of Summary Judgment at 4 and Exhibit 1 at 15 (deposition of Dr. Meek).

of the pill is implicit in the Food and Drug Administration package insert regulations. Ms. MacPherson relies squarely and solely for this proposition on the Supreme Judicial Court of Massachusetts' 1985 decision in *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65 (1985), which held both that oral contraceptive manufacturers bear a common law duty to warn directly and that compliance with FDA rules on package inserts constitutes mere evidence of compliance with that duty. *Id.* 475 N.E.2d at 70–71.

The dissent to the *MacDonald* decision noted that "no other court has embraced the rule laid down today by the court," *id.* 475 N.E.2d at 73, and that observation appears to remain true today. *See* James L. Rigelhaupt, Jr., Annotation, *Liability of Manufacturer or Seller for Injury or Death Allegedly Caused by Use of Contraceptive*, 70 A.L.R.3d 315, Sect. 6 (1976 & Supp.1991). By contrast, the *MacDonald* dissent identified fourteen decisions by eight state appeals courts, four federal district courts, and the First and Second Circuit Court of Appeals, all adhering to the learned intermediary doctrine—or the "'prescription drug' rule"—in cases involving manufacturers of oral contraceptives. *MacDonald*, 475 N.E.2d at 73.

Given the weight of this authority, this Court is persuaded that summary judgment for Searle is appropriate in this matter. Judge Ellen Burns's decision in *Goodson v. Searle Laboratories* is directly in point. 471 F.Supp. 546 (D.Conn.1978) (finding no duty to warn oral contraceptive user directly and granting summary judgment). *Accord Taurino v. Ellen*, 397 Pa.Super. 50, 579 A.2d 925 (1990) (same; affirming summary judgment), and *Cobb v. Syntex Laboratories*, 444 So.2d 203 (La.App. 1 Cir. 1983) (same; affirming summary judgment).

■ However, there is a basis for this Court to rule in favor of Searle in addition to that provided by the learned intermediary doctrine, which the District of Columbia has yet to extend to oral contraceptives. We are able to determine on the record at hand that, even assuming Searle bore a duty of ordinary care to warn Ms. MacPherson directly of potential eye-related risks of Demulen, Searle fulfilled this duty as a matter of law by providing the brief, consumer-oriented warnings contained in its package insert, which Ms. MacPherson acknowledges having read.

The primary support for this holding is the plain language of the package insert itself. As stated, the insert refers the user to the "detailed leaflet" on Demulen, which expressly warns that blindness can occur, and it states that proper use of the pills requires a doctor's continuing supervision. It further warns that the pills are "associated with serious side effects that may be fatal," including, "1. Blood clots in the . . . eyes" and "3. Disorders of vision." These warnings and admonitions appear to this Court sufficient to place the user, at a bare minimum, on inquiry notice of the severity of risk—to the eyes or otherwise—associated with Demulen use. As the D.C. Court of Appeals stated in deciding a recent drug liability suit, "[w]e seriously doubt that promotional materials which warn of death as a possible reaction to a drug could be inadequate to warn of a consequence any less severe." *Mampe v. Ayerst Laboratories*, 548 A.2d 798 (D.C.App.1988) (suit against maker of alcoholism therapeutic drug Antabuse for injuries resulting from drinking while taking the drug).

Moreover, the length, tenor and specificity of the Demulen package insert warnings is fully consistent with FDA regulations mandating "a *brief summary* of certain *essential information* included in each package dispensed to each patient." 21 C.F.R. 310.501 (emphasis added). The FDA Commissioner's comments in 1978 on the enhanced package-insert requirements for oral contraceptives (*see* footnote 7 *supra*) indicate clearly that the inserts were not intended to interfere with the prescription-only status of the pills.

Patient labeling serves primarily as an informational adjunct to the physician-patient encounter and is intended to reinforce and augment oral information given by the physician to the patient at the time the drug is prescribed. The physi-

cian, who by training and experience is best equipped to tailor discussion of drug therapy to the needs of individual patients, has the primary responsibility for advising patients about such information as directions for use, cautions against misuse, and warnings about possible adverse reactions.... Even when physicians rely mainly on written drug information to inform their patients and when patient labeling will, therefore, serve as a primary informational source to patients, that labeling still acknowledges the primary responsibility of the physician and suggests that the patient make decisions regarding use of the drug in consultation with her physician.

43 Fed.Reg. 4215 (January 31, 1978). The Commissioner's comments also indicate the FDA's intention that package insert regulations for oral contraceptives *not* "affect adversely the standard of civil tort liability which is imposed on drug manufacturers and dispensers." *Id.* at 4214. Rather, the Commissioner envisioned in 1978 that package inserts "will as likely result in reduced potential liability due to improved patient compliance with physician directions and self-monitoring." *Id.*

Given the foregoing, it is apparent to this Court that defendant Searle has both (1) demonstrated that plaintiff MacPherson's evidence is insufficient to establish an essential element of her claim, *i.e.,* a duty of ordinary care to warn directly, and (2) submitted affirmative evidence sufficient to negate an essential element of her claim, *i.e.,* that the warning given was insufficient. Accordingly, there is not sufficient evidence favoring Ms. MacPherson for a jury to return a verdict for her, and Searle is therefore entitled to summary judgment as a matter of law.

*Conclusion*

For the reasons stated, summary judgment is entered in favor of defendant Searle on Counts One, Two, and Three of the Complaint, and summary judgment is denied to defendant Dr. Meek on Count Four of the Complaint.

ATTACHMENTS

1. Excerpts from Physician Prescribing Information

## WARNINGS

***

The use of oral contraceptives is associated with increased risk of several serious conditions including venous and arterial thromboembolism, thrombotic and hemorrhagic stroke, myocardial infarction, visual disorders, hepatic tumors, gallbladder disease, hypertension, and fetal abnormalities. Practitioners prescribing oral contraceptives should be familiar with the following information relating to these and other risks.

1. *Thromboembolic Disorders and Other Vascular Problems.* An increased risk of thromboembolic and thrombotic disease associated with the use of oral contraceptives is well established. One study in Great Britain demonstrated an increased relative risk for fatal venous thromboembolism; several British and U.S. studies demonstrated an increased relative risk for nonfatal venous thromboembolism. U.S. studies demonstrated an increased relative risk for stroke, which had not been shown in prior British studies. In those studies it was estimated that users of oral contraceptives were 1.9 to 11 times more likely than nonusers to manifest these diseases without evident cause (Table 2). In a British study of idiopathic deep vein thrombosis and pulmonary embolism, the projected annual hospitalization rates for women aged 16-40 were 47 per 100,000 users and 5 for nonusers. In one British mortality study, overall excess mortality due to pulmonary embolism or stroke was on the order of 1.3 to 3.4 deaths annually per 100,000 users and increased with age.

***

Table 2. *Summary of Relative Risks of Thromboembolic Disorders and Other Vascular Problems in Oral Contraceptive Users Compared with Nonusers.*

| *Disorders* | *Relative Risk* |
| --- | --- |
| Idiopathic thrombo-<br> embolic disease | 2 to 11 times greater |

***

The physician and patient should be alert to the earliest manifestations of thromboembolic and thrombotic disorders (eg, thrombophlebitis, pulmonary embolism, cerebrovascular insufficiency, coronary artery disease or myocardial infarction, <u>retinal thrombosis</u>, and mesenteric thrombosis). Should any of these occur or be suspected, the drug should be discontinued immediately. (emphasis added)

***

2. *Ocular Lesions*. There have been reports of neuro-ocular lesions such as optic neuritis or <u>retinal thrombosis</u> associated with the use of oral contraceptives. Discontinue medication if there is unexplained, gradual or sudden, partial or complete loss of vision; proptosis or diplopia; papilledema; or any evidence of retinal vascular lesions. Appropriate diagnostic and therapeutic measures should be instituted. (emphasis added)

***

**Precautions:**

***

10. .... The following alterations in laboratory results have been observed with the use of oral contraceptives:

***

b. Coagulation tests: Increased prothrombin and coagulation factors VII, VIII, IX, and X; decreased antithrombin III; increased platelet aggregability.

***

**Adverse Reactions:**

***

There is evidence of an association between the following conditions and the use of oral contraceptives, although confirmatory studies have not been done:

***

Neuro-ocular lesions (eg, retinal thrombosis and optic neuritis)

SEP 19,91 11:00 NO.001

## BRIEF SUMMARY OF PATIENT LABELING

Cigarette-smoking increases the risk of serious adverse effects on the heart and blood vessels from oral contraceptive use. This risk increases with age and with heavy smoking (15 or more cigarettes per day) and is quite marked in women over 35 years of age. Women who use oral contraceptives should not smoke.

*In the detailed leaflet, "What You Should Know About Oral Contraceptives," which you have received, the risks and benefits of oral contraceptives are discussed in much more detail. This leaflet also provides information on other forms of contraception. Please take time to read it carefully for it may have been recently revised.*

*If you have any questions or problems regarding this information, contact your doctor.*

Oral contraceptives taken as directed are about 99% effective in preventing pregnancy. (The mini-pill, however, is somewhat less effective.) Forgetting to take your pills increases the chance of pregnancy.

Women who have or have had clotting disorders, cancer of the breast or sex organs, unexplained vaginal bleeding, stroke, heart attack, chest pains on exertion (angina pectoris), liver tumors associated with the use of the pill or with other estrogen-containing products, or who suspect they may be pregnant should not use oral contraceptives.

Most side effects of the pill are not serious. The most common side effects are nausea, vomiting, bleeding between menstrual periods, weight gain, and breast tenderness. However, proper use of oral contraceptives requires that they be taken under your doctor's continuing supervision, because they can be associated with serious side effects which may be fatal. Fortunately, these are very uncommon, but the risks may persist after use of the pill is discontinued. The serious side effects are:

1. Blood clots in the legs, arms, lungs, brain, heart, eyes, abdomen, or elsewhere in the body.
2. Bleeding in the brain (hemorrhage) as a result of bursting of a blood vessel.
3. Disorders of vision.
4. Liver tumors, which may rupture and cause severe bleeding.
5. Birth defects if the pill is taken during pregnancy.
6. High blood pressure.
7. Gallbladder disease.

The symptoms associated with these serious side effects are discussed in the detailed leaflet given you with your supply of pills. Notify your doctor if you notice any unusual physical disturbance while taking the pill.

Breast cancer and other cancers have developed in certain animals when given the estrogens in oral contraceptives for long periods. These findings suggest that oral contraceptives may also cause cancer in humans. However, studies to date in women taking currently marketed oral contraceptives have not confirmed that oral contraceptives cause cancer in humans.

*Caution:* Oral contraceptives are of no value in the prevention or treatment of venereal disease.

Various drugs, such as antibiotics, may also decrease the effectiveness of oral contraceptives.

2. Package Insert

Your Compack® tablet dispenser consists of two parts, the case and a Refill containing 28 individually sealed pills. Note that the pills are arranged in four numbered rows of 7 pills each with the days of the week printed above them. The 21 white pills are Demulen 1/35™ tablets. The 7 blue pills are inactive; their only purpose is to help make your pill-taking schedule simple and easy to remember.

You must take your pills in order, one pill each day at intervals of 24 hours. *Always start with the white pills in row #1.* To remove a pill press down on it. The pill will drop through a hole in the bottom of the Compack.

### Pill Schedule

When you start taking Demulen 1/35™-28 for the first time, use an additional method of protection until you have taken your first 7 white pills.

Sep 19,91 11:00 NO.00-

1. Begin taking pills on the first Sunday after your period begins unless your period begins on Sunday. *If your period begins on Sunday you will take your first pill that very same day.* Start with the Sunday pill in row #1.

2. After the Saturday pill in row #1 has been taken begin taking the pills in row #2, and so on, until all 28 pills have been taken. Your last pill, a blue one, will be taken on Saturday (bottom row #4). Your period will *usually occur while you are* taking the blue pills.

3. Replace the Refill in your Compack and, without any interruption in pill-taking, begin a new 28-pill cycle the next day, Sunday. Take one pill each day until you have taken the last (Saturday) blue pill, and again start a new Refill on Sunday.

FORGOTTEN PILLS

The best time to take your daily pill may be either with your evening meal or at bedtime.

There is little likelihood of your getting pregnant if only one white pill is missed; however, the possibility of pregnancy increases with each successive day that the scheduled white pills are missed.

If you forget to take a white pill one day take two the next day—the one you forgot as soon as you remember and your regular pill at your usual time.

If you forget your white pills on two consecutive days do not be surprised if you spot or start to flow. Take two pills each day for the next two days, and use an additional method of protection for the remainder of the pill cycle.

If you forget to take one or more blue pills begin a new pill cycle on the next Sunday, again starting with the white pills. Missing the blue pills does not increase the possibility of conception providing that the white pill schedule has been followed.

THINGS TO REMEMBER

All women do not respond to Demulen 1/35™ in the same way; therefore, it may take a cycle or two for you to adjust.

You should have regular checkups and your physician's approval for refilling your prescription.

Your prescription number is on the label inside your Compack. Please show your pharmacist this number when obtaining Refills.

EXHIBIT
MacPherson 2
OK 1-5-70

Keep ... the reach
of ...
Sto ... for expiration ...

**SEARLE** Searle & Co,
San Juan PR 00936

©1985, Searle & Co.
AO5526-1 • September 1985 • Printed in USA

**Demulen 1/35-28**
Each white tablet contains ethynodiol diacetate 1 mg and ethinyl estradiol 35 mcg. Each blue tablet is a placebo containing no active ingredients.
Compack® tablet dispenser

**FOR THE PATIENT**
**Directions for Use**
Caution: Federal law prohibits dispensing without prescription.